IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JENNIFER RYAN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) No. 2:05-cv-1423 |
| | ) |
| JO ANNE B. BARNHART, | ) Judge Thomas M. Hardiman |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

### I.    Introduction

Plaintiff Jennifer Ryan (Ryan) brings this action pursuant to 42 U.S.C. §405(g) of the

Social Security Act (Act), seeking review of the final determination of the Commissioner of

Social Security (Commissioner) denying her application for Supplemental Security Income (SSI)

benefits. This matter is before the Court on the parties' cross motions for summary judgment

under Rule 56 of the Federal Rules of Civil Procedure based on the record developed at the

administrative proceedings.

After careful consideration of the Administrative Law Judge's (ALJ's) decision, the

memoranda of the parties and the entire record, the Court finds the ALJ's decision is supported

by substantial evidence. Therefore, the Court will deny Ryan's motion for summary judgment,

grant Defendant's motion, and affirm the determination by the Commissioner.

## II.    Procedural History

On June 3, 2003, Plaintiff's grandmother applied for child's SSI payments on Ryan's behalf, alleging disability beginning September 1, 1990 because of anxiety and mood disorders. (R. 44, 70). After her application was denied, Ryan requested an administrative hearing. (R. 44-50). The hearing was held on December 7, 2004 before ALJ Melvin Benitz, at which Ryan and a vocational expert testified. (R. 23-43). Ryan was represented at the hearing by Karl Osterhout, Esq. (R. 23).

ALJ Benitz issued an unfavorable decision on January 27, 2005, (R. 12-21), and Ryan appealed on February 23, 2005. (R. 8). On August 23, 2005, the Appeals Council denied Ryan's appeal, rendering the ALJ's opinion the final decision of the Commissioner. (R. 4-7). Ryan timely filed this civil action on October 17, 2005.

On May 8, 2006, Ryan filed her Motion for Summary Judgment. (Pl. Mot.) The Commissioner filed her Motion for Summary Judgment (Comm. Mot.) on May 30, 2006. On July 27, 2006, the Court heard oral argument on the cross-motions for summary judgment, took the matter under consideration, and the matter is ripe for adjudication.

## III.    Facts

Ryan was born on September 23, 1985 and was 19 years of age at the time of the ALJ's decision, making her a "younger person" under the regulations. *See* 20 C.F.R. §404.1563; *see also* 20 C.F.R. §416.963. She was a special education student throughout high school, but did graduate. (R. 26). Ryan worked previously as a cook in a fast food restaurant, where she had worked nine hours per week. (R. 26-27). At the time of the hearing, Ryan lived with her

2

grandparents and received child-support payments from her father. (R. 26, 31).

Ryan began receiving mental health treatment at the age of six and she has been in treatment for depression since she was eleven years old. (R.14, 341-42). After Ryan began exhibiting emotional and behavioral problems at school, Laura Newman, M.S., a psychologist at Ryan's middle-school, performed a psychological evaluation on March 5, 1999. (R. 304-08). Testing showed that Ryan was functioning within the low-average range, with better non-verbal than verbal skills. (R. 306). At that time, Ryan's social activities and interests appeared to be age-appropriate. (R. 307).

On April 20, 2002, Dr. Michael Sansone, a high-school psychologist, administered the Wechsler Adult Intelligence Scale-Third Edition (WAIS-III) test to Ryan. (R. 309). The WAIS-III test showed that Ryan had a Verbal I.Q. of 75, a Performance I.Q. of 91, and a Full Scale I.Q. of 80. (R. 309). Because of the size of the gap between Ryan's verbal and performance abilities, Dr. Sansone concluded that her Full Scale I.Q. could not be reliably interpreted, but he noted that her verbal abilities were in the borderline range and her non–verbal abilities fell in the average range. (R. 316). Notwithstanding her relatively low I.Q., Ryan received mostly B and C grades (as well as some A's) in high school. (R. 224-26, 250-51, 267-68). In addition, Ryan was a member of the chorus, bowling team, and swim team. (R. 398). She received her high school diploma in June 2003.

In the Spring of 2003, social workers evaluated Ryan's progress on two separate occasions. They agreed that Ryan's mental health was stable, that she communicated well, and that she had adapted to change and socialized properly. (R. 193-96, 233). One social worker opined that Ryan would benefit from a vocational training program, (*see* R. 195); shortly

3

thereafter, Ryan applied for and was accepted into a vocational program, with a planned start date in November 2004.  (R. 220-21).

By late 2003, Ryan had applied for SSI, and was neither in school nor employed. (R. 404-05).  Although Ryan had expressed goals of obtaining training, employment and a driver's license, her grandmother had been encouraging her to seek SSI.  (R. 410, 413-15).  Ryan enjoyed decorating, watching television, bowling, fishing, swimming, basketball, football, watching baseball, talking on the telephone, playing pool, and sleeping.  (R. 398).  Indeed, Ryan reported that she wanted to join a bowling league and to find a place where she could shoot pool on a regular basis.  (R. 402).  Ryan also reported that her chores at home included keeping her room clean, doing her own laundry, washing dishes, dusting, and vacuuming.  (R. 395).  Ryan anticipated getting engaged by December 2003, and getting married in 2004.  (R. 372).

In October 2003, Ryan visited Tim Bridges, Ph.D., for a psychological assessment. (R. 340-44).  Ryan explained to Dr. Bridges that she needed the assessment in support of her application for disability benefits, which she sought for her emotional outbursts and behavioral problems.  (R. 341).  She also told Dr. Bridges that Prozac was not relieving her depression. (R. 341).  After reviewing the record, including the results of Dr. Sansone's I.Q. test, Dr. Bridges opined that Ryan's intellect was in the low-average range and diagnosed her with a chronic post-traumatic stress disorder (PTSD), a recurrent major depressive disorder, and bipolar schizophrenia.  (R. 341, 343-44).  He opined further that Ryan would have "moderate" to "marked" restrictions in interacting appropriately with the public, co-workers, or supervisors, or in responding to changes and pressures in a normal work setting.  (R. 345).  In addition, Dr. Bridges considered Ryan to be moderately impaired in her ability to understand, remember, carry

4

out detailed instructions, or to make simple work-related decisions. (R. 345). Ultimately, Dr. Bridges noted that Ryan needed anti-psychotic medications, and pegged her Global Assessment of Functioning[1] at 40. (R. 344, 346). However, the only actual testing Dr. Bridges did was a "serial sevens" examination;[2] the remainder of his information was derived from his conversation with Ryan herself, as well as his review of the medical record. (R. 343).

In December 2003, however, Sanford Golin, Ph.D. — the state agency physician who reviewed Ryan's file — concluded that her subjective symptom testimony was only partially credible, determined that the limitations Dr. Bridges had found were only partially supported by the record, and opined that she had only "moderate" limitations in a few areas of functioning — namely, in her ability to understand, remember, and carry out detailed instructions, the ability to concentrate for extended periods, complete a normal workday without interruption, interact appropriately with the general public, accept criticism from supervisors, get along with co-workers, respond appropriately to changes in the work setting, and set realistic goals — none of which would impair her ability to meet the mental demands of full-time work. (*See* R. 351-52).

---

[1]     The Global Assessment of Functioning test (GAF) measures a person's psychological, social, and occupational functioning on a hypothetical continuum of mental health/illness using a scale 1-100. *See* American Psychiatric Association, Diagnostic and Statistical Manual 27-36 (4th ed. 2000) (DSM-IV). A GAF score of 31-40 signifies "some impairment in reality testing or communication . . . or major impairment in several areas, such as work or school, family relations, judgment, thinking or mood." *See* DSM-IV at 34. A GAF score of 41-50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) [or] any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *Id.* Thus, "[a] score of 40 is on the borderline between "some impairment" and serious symptoms." *Dougherty v. Barnhart*, No. 05-CV-5383, 2006 WL 2433792, at *3 n.2 (E.D. Pa. Aug. 21, 2006).

[2]     "Serial sevens" is "a test of concentration measuring the ability to accurately subtract 7 from 100, then 7 from 93, then 7 from 86, etc." *See Catrain v. Barnhart*, 325 F. Supp.2d 183, 188 (E.D. N.Y. 2004).

5

Dr. Golin gave Dr. Bridges' opinion only "partial" credence, explaining that it represented a "snapshot" which, in light of the rest of the medical record, had overestimated Ryan's limitations.  (R. 353).

In early November 2003, and shortly after her visit with Dr. Bridges, Ryan began a course of medical treatment at Latrobe Mental Health Center.  That treatment coincided roughly with Ryan's primary care physician switching her medication from Prozac to Zoloft.  (*See* R. 382). From December 2003 to March 2004, Ryan was counseled by a social worker at Latrobe Mental Health; during each visit, the social worker entered a GAF score of 50 in the appropriate blank on a group progress note form.  (*See* R. 409-16).

By the time Ryan underwent a psychiatric evaluation by Gowri Arul, M.D., in March 2003, Zoloft had alleviated her symptoms.  (*See* R. 417-18).  After noting that Ryan had a history of using street drugs, including cocaine, and recording her claim that her polysubstance abuse had been in remission for the past eight months, (*see* R. 387, 417), Dr. Arul diagnosed Ryan with bipolar disorder and borderline personality disorder, with a history of polysubstance abuse. (R 418).  Dr. Arul also apparently adopted the social worker's GAF assessment of 50.  (R. 418).

By May 2004, Ryan reported that she had begun working part-time at Wendy's.  (R. 393). By the autumn of 2004, the medical record shows that Ryan continued to take Zoloft and her symptoms improved perceptibly after her dosage was increased.  (R. 370, 405).  Another psychological examination was performed in November 2004; at that time, Ryan's I.Q. tested in the borderline range, as it had earlier.  (R. 422-25).  In October and December 2004, another physician (whose name is illegible) repeated Dr. Arul's GAF assessment of 50.  (R. 404, 406). Without explanation, Dr. Arul again noted Ryan's GAF score was 50 on a fill-in-the-blank

6

treatment form in December 2004. (R. 407).

At the hearing, Ryan testified as to her background and limitations. After summarizing her educational and employment history, Ryan stated that she saw a therapist on a weekly basis — and a psychiatrist about once every two or three months — at Latrobe Mental Health. (R. 27). She added that she took Zoloft as prescribed to treat her depression, and took Visteril as needed for anxiety. (R. 27-28). When Ryan felt an episode of anxiety coming on, she would take Visteril and immediately fall asleep for approximately three hours; thereafter, she would awake feeling better. (R. 28). Ryan admitted that her symptoms were much better on Zoloft, than they had been on Prozac. (R. 38-39).

Even with these prescription medications, however, Ryan stated that she experienced insomnia accompanied by difficulty motivating herself to get out of bed in the morning, adding that it would take her "two hours" to get up even after drinking several cups of coffee. (R. 29-30). She explained that her depression still resulted in "bad days," which she described as entailing "crying, then ang[er], then crying, then suicide thoughts, then sleeping half the day and don't want to be bothered." (R. 29, 31, 39). Ryan stated that she had acted on her "suicide thoughts" by "cutting" herself in the past, but admitted that she had not succumbed to this cutting compulsion for approximately one year. (R. 36). Ryan estimated that, in any given month, she would experience 28 of these "bad days." (R. 31).

Regarding her day-to-day activities, Ryan testified that she does not drive. (R. 32). She explained that she remained single, and lived with her grandmother, grandfather, and an uncle. (R. 31, 35). She explained that her only source of income was some $600 in monthly child support from her father. (R. 35). Ryan explained that she washed her own laundry and dishes,

7

and added that she would "chip in" on other tasks. (R. 31). According to Ryan, she could do chores for three hours at a stretch before becoming exhausted. (R. 32). At the time of the hearing, Ryan incorrectly testified that she had not yet learned of her admission to vocational school, where she would receive training as a general office clerk as well as on-site psychiatric support services. (R. 32-33, 220). Ryan conceded, however, that her training would consume eight hours per day, five days per week. (R. 33).

The ALJ next heard testimony from Mark Heckman, a vocational expert. (R. 39). The ALJ posed the following hypothetical question to this expert:

[A]ssume a hypothetical person who is 18 years of age on her application, then having 12th grade special education, [a] right-handed individual, suffering mainly from depression and anxiety that's caused her to have some mood swings and some suicidal ideations on occasion, decreases her ability to motivate and her energy is at a lower state, but somewhat relieved by her medications now, that she derives her sleepiness from it after an hour of ingestion, and would need a job, [...] of low stress in nature, concentration and memory, she's able to attend tasks and complete schedules, probably the job would have little interaction with the public due to her anger, if it develops, but would be able to do medium work activities[.]

(R. 39-40). In response to this question, the expert testified that this hypothetical person could perform a variety of unskilled jobs at the medium level of exertion, including the jobs of inventory clerk, house cleaner, and janitor, all jobs which existed in significant numbers in the local and national economies. (R. 40). Mr. Heckman admitted, however, that if this person were missing more than five to ten days per year because of absences for illness, she would be unable to engage in competitive employment. (R. 41). After agreeing to hold the record open to permit Ryan to submit the results of a then-recent evaluation performed at the Hiram G. Andrews Rehabilitation Center in Johnstown, Pennsylvania, the ALJ adjourned the hearing. (R. 42).

8

On the basis of the evidence before him, the ALJ issued a decision which evaluated Ryan's condition using the five-step sequential process. *See* 20 C.F.R. §416.920. At step one of that process, the ALJ determined that Ryan's work as a cook at Wendy's was not substantial gainful activity, and found that she had not engaged in any such activity since her alleged date of onset. (R. 13). Accordingly, the ALJ proceeded to evaluate Ryan's impairments.

At the second and third steps of the sequential process, the ALJ determined that Ryan suffers from depression. (R.13). The ALJ considered this impairment to be "severe" within the meaning of the Regulations, but not severe enough to meet or equal a listed impairment, as defined in Appendix 1, Subpart P of the Regulations. (R. 13). The ALJ then assessed Ryan's residual functional capacity. After explaining that he found Ryan's testimony "generally credible," he rejected it "to the extent that she has described limitations which exceed what is shown by the objective medical evidence and treatment records," (R. 16). The ALJ concluded that Ryan could perform medium work "that is low stress and that has low concentration and memory requirements." (R. 16).

On the basis of this residual functional capacity, the ALJ made the step-four finding that Ryan had no "past relevant work." (R. 18). The ALJ found, however, that Ryan nevertheless could adjust to a partial range of medium work and perform the jobs that the vocational expert had identified. (R. 19). Accordingly, on June 13, 2006, the ALJ concluded that Ryan was not disabled at step five of the sequential process. (R. 20).

9

## IV.   Standards of Review

To demonstrate disability under Title II or Title XVI of the Act, a claimant must

demonstrate an inability to "engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected to result in death or which

has lasted or can be expected to last for a continuous period of not less than twelve months."

42 U.S.C. §423(d)(1); 42 U.S.C. §1383c(a)(3)(A).  When resolving the issue of whether a

claimant is disabled and whether the claimant is entitled to either DIB or SSI benefits, the

Commissioner applies a five-step analysis. *See* 20 C.F.R. §§404.1520 and 416.920 (1995).  The

United States Court of Appeals for the Third Circuit summarized this five step process in

*Plummer v. Apfel*, 186 F.3d 422 (3d Cir. 1999) as follows:

> In *step one*, the Commissioner must determine whether the claimant is
> currently engaging in substantial gainful activity.  20 C.F.R. § 404.1520(a).  If a
> claimant is found to be engaged in substantial activity, the disability claim will
> be denied . . . .
>
> In *step two*, the Commissioner must determine whether the claimant is
> suffering from a severe impairment.  20 C.F.R. § 404.1520(c).  If the claimant
> fails to show that her impairments are "severe," she is ineligible for disability
> benefits.
>
> In *step three*, the Commissioner compares the medical evidence of the
> claimant's impairment to a list of impairments presumed severe enough to
> preclude any gainful work.  20 C.F.R. § 404.1520(d).  If a claimant does not
> suffer from a listed impairment or its equivalent, the analysis proceeds to steps
> four and five.  *Step four* requires the ALJ to consider whether the claimant
> retains the residual functional capacity to perform her past relevant work.  20
> C.F.R. § 404.1520(d).  The claimant bears the burden of demonstrating an
> inability to return to her past relevant work . . . .
>
> If the claimant is unable to resume her former occupation, the evaluation
> moves to the final *step [five]*.  At this stage, the burden of production shifts to
> the Commissioner, who must demonstrate the claimant is capable of performing
> other available work in order to deny a claim of disability.  20 C.F.R.
> § 404.1520(f).  The ALJ must show there are other jobs existing in significant

10

numbers in the national economy which the claimant can perform, consistent
with her medical impairments, age, education, past work experience, and
residual functional capacity. The ALJ *must analyze the cumulative effect of all
the claimant's impairments* in determining whether she is capable of performing
work and is not disabled. The ALJ will often seek the assistance of a vocational
expert at this fifth step . . . .

*Plummer*, 186 F.3d at 428 (emphasis added; certain citations omitted). The district court's

function is to determine whether the record, *as a whole*, contains substantial evidence to support

the Commissioner's findings. *See Adorno v. Shalala*, 40 F.3d 43, 46 (3d Cir. 1994), *citing*

*Richardson v. Perales*, 402 U.S. 389, 401 (1971).

Judicial review of the Commissioner's final decision on disability claims is provided by

42 U.S.C. §§405(g)[3] and 1383(c)(3).[4]  Congress has provided that the findings of fact of the

Commissioner of Social Security in determining eligibility for disability benefits shall be

conclusive if supported by "substantial evidence." *See* 42 U.S.C §405(g); *see also Ventura v.*

*Shalala*, 55 F.3d 900, 901 (3d Cir. 1995). The Supreme Court has explained that "substantial

evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion." *Richardson,* 402 U.S. at 401 (citation omitted). The Third Circuit has referred to

this standard as "less than a preponderance of the evidence but more than a mere scintilla."

---

[3]     Section 405(g) provides in pertinent part: "Any individual, after any final decision of the
[Commissioner] made after a hearing to which he was a party, irrespective of the amount
in controversy, may obtain a review of such decision by a civil action . . . brought in the
district court of the United States for the judicial district in which the Plaintiff resides, or
has his principal place of business . . . ."  42 U.S.C. §405(g).

[4]     Section 1383(c)(3) provides in pertinent part: "The final determination of the
Commissioner of Social Security after a hearing under paragraph (1) shall be subject to
judicial review as provided in section 405(g) of this title to the same extent as the
Commissioner's final determinations under section 405 of this title."
42 U.S.C. §1383(c)(3).

*Burns v. Barnhart,* 312 F.3d 113, 118 (3d Cir. 2002) (citation omitted). "A single piece of
evidence will not satisfy the substantiality test if the [Commissioner] ignores, or fails to resolve,
a conflict created by countervailing evidence." *Mason v. Shalala,* 994 F.2d 1058, 1064 (3d Cir.
1993) (citation omitted). However, the possibility that two inconsistent conclusions may be
drawn from the evidence contained in the administrative record does not prevent an agency's
finding from being supported by substantial evidence. *See Consolo v. Federal Maritime
Comm'n,* 383 U.S. 607, 620 (1966). This standard allows a court to review a decision of an ALJ,
yet avoid interference with the administrative responsibilities of the Commissioner. *See Stewart
v. Secretary of HEW,* 714 F.2d 287, 290 (3d Cir. 1983).

## V.   Analysis

Ryan articulates three grounds for reversible error. First, although she acknowledges that
the ALJ held the record open to permit her to introduce the results of a psychological evaluation
performed on November 19, 2004, she complains that the ALJ's decision makes no mention of
that medical evidence. (Pl. Mot. at 5-6). Second, Ryan insists that the ALJ gave short shrift to
her GAF scores, all of which ranged from 40 to 50 throughout the course of her treatment.
(Pl. Mot. at 7-13). Finally, Ryan complains that — because of the ALJ's disregard of the latest
psychological evaluation and his allegedly insufficient consideration of her GAF scores — the
hypothetical question he posed to the vocational expert was fatally underinclusive of her
limitations. (Pl. Mot. at 14-17). These arguments are addressed *seriatim*.

## A.     The ALJ's Failure To Mention The November 19, 2004 Psychological Evaluation Does Not Require Remand

According to Ryan, the ALJ's failure to mention the November 19, 2004 psychological evaluation in his decision is a serious error warranting remand. (Pl. Mot. at 5-6). The Commissioner appears to concede that the ALJ did not mention this particular evidence, but contends that this omission was not prejudicial because this evidence was cumulative of other evidence that the ALJ *did* discuss and reject. (Comm. Mot. at 10-11). After reviewing the medical record, the Court agrees with the Commissioner.

At the administrative hearing, the ALJ agreed to hold the record open so that Ryan could introduce a psychological assessment conducted shortly before the hearing on November 19, 2004 by Frank Lang, M.A. (R. 42). On December 28, 2004, Ryan's counsel submitted this evidence to the ALJ. (R. 419, 422-25). Nearly one month later, on January 27, 2005, the ALJ rendered his decision without mentioning the Lang evaluation. (R. 12-21).

The Court of Appeals for the Third Circuit requires the ALJ to set forth the reasons for his decision to facilitate "meaningful judicial review." *See Burnett v. Comm'r of Soc. Sec. Admin.,* 220 F.3d 112, 119 (3d Cir. 2000) (citing *Cotter v. Harris,* 642 F.2d 700, 704-05 (3d Cir. 1981)). The ALJ's explanations must be sufficiently thorough to allow the reviewing court to evaluate whether the ALJ's decision was based on substantial evidence. *See Cotter,* 642 F.2d at 705. This requirement enables a reviewing court to determine whether "significant probative evidence was not credited or simply ignored." *Fargnoli v. Massanari,* 247 F.3d 34, 42 (3d Cir. 2001). Consistent with this principle, "[t]he ALJ must consider all the evidence and give some reason for discounting the evidence she rejects." *Plummer,* 186 F.3d at 429.

13

At the same time, it is well-established that the ALJ need not discuss every piece of relevant evidence in the record. *See Fargnoli,* 247 F.3d at 42 (ALJ need not discuss or refer to every piece of relevant evidence in the record, so long as the reviewing court can discern the basis of decision). Recognizing the distinction between the words "consider" and "discuss" is the key to reconcile *Plummer* and *Fargnoli*. "The fact that [an] ALJ did not *discuss* every statement made by every doctor does not mean she did not *consider* them." *See Lee v. Barnhart,* No. 04-CIV-1767, 2006 WL 891433, at *4 (E.D Pa. Apr. 6, 2006) (emphasis added). Furthermore, under *Burnett,* 220 F.3d 112, an ALJ need only "consider and explain his reasons for discounting all of the *pertinent* evidence before him in making his . . . determination." *Id.* at 121 (emphasis added). Thus, evidence that is not pertinent or probative need not be discussed. *See id.*

In this case, a review of the content of Dr. Lang's report confirms that the ALJ's failure to mention it in his decision does not warrant remand. At the outset, the Court notes that it is nothing more than a summarization of the WAIS-III scores that Ryan achieved during her November 2004 test. (R. 422-25). Nowhere in that report does Dr. Lang purport to assess Ryan's functional limitations, GAF, or even opine whether her I.Q. might somehow limit her ability to engage in gainful employment. Accordingly, Dr. Lang's report is cumulative of the April 2002 psychological evaluation given by Dr. Sansone, Ryan's school psychologist. (R. 309-17). Therein, Dr. Sansone also administered the WAIS-III and concluded that Ryan had nearly the same scores as Dr. Lang would later assign, and likewise found that her scores placed her intelligence in the average to borderline range. (*Compare* R. 309 *with* R. 424). Significantly, the ALJ accepted Dr. Sansone's assessment of Ryan's I.Q. (R. 14).

14

In the final analysis, the Court is mindful of the Third Circuit's teaching that an ALJ's failure to discuss every piece of evidence will not require remand unless the claimant can show that his failure "affect[ed] the outcome of the case." *See Rutherford v. Barnhart*, 399 F.3d 546, 553 (3d Cir. 2005). Since the ALJ accepted the I.Q. scores as found by Dr. Sansone in April 2002 but found that Ryan's mental limitations were not disabling, there is no reason to suppose that remanding this matter to compel the ALJ to discuss the *nearly identical scores* found by Dr. Lang would change the outcome of this case. Accordingly, the Court finds that the ALJ's failure to mention this evidence is immaterial and remand is not warranted.

## B.    The ALJ's Rejection Of Some Of Ryan's GAF Scores And His Failure To Discuss GAF Scores Assessed By A Social Worker Do Not Require Remand

Ryan's second challenge to the decision criticizes the ALJ's handling of the medical evidence. Specifically, Ryan maintains that the ALJ ignored a GAF score of 40 from an examining physician, and ten scores of 50 from her treating physicians. (*See* Pl. Mot. at 7, 10, 13). On the theory that the ALJ's failure to mention every one of her GAF scores resulted in the exclusion of some functional limitations from her residual functional capacity, Ryan argues that this matter should be remanded to the ALJ with instructions to reconcile his decision with her GAF scores. (*See* Pl. Mot. at 13, 17).

"A cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight." *Morales v. Apfel,* 225 F.3d 310, 317 (3d Cir. 2000). "[G]reater weight should be given to the findings of a treating physician than to a physician who has examined the claimant as a consultant." *Adorno v. Shalala,* 40 F.3d 43, 47 (3d Cir. 1994). Although the opinions of agency reviewing physicians' who have neither treated nor examined

15

the claimant generally are afforded the least weight in this evidentiary hierarchy, *see* 20 C.F.R. §404.1527(f), opinions rendered by these non-examining physicians can provide substantial evidence to support the ALJ's decision, and may be accepted over the opinions of a treating physician if they are more consistent with the record as a whole. *See Jones v. Sullivan,* 954 F.2d 125, 128-29 (3d Cir. 1991); *see also* 20 C.F.R. §416.927(d)(4). Regardless of its source, however, no physician's opinion on the ultimate issue of disability — not even that of a treating physician — is entitled to any special significance. *See* 20 C.F.R. §§404.1527(e)(1); *see also* Social Security Regulation 96-5p.

Where, as here, physicians' opinions are based largely or entirely upon statements made by the claimant, the ALJ's assessment of the claimant's credibility assumes an important role in the weight given to the medical evidence. On this point, it is worth noting that it is the ALJ's responsibility — and not this Court's — to resolve conflicts in the evidence and to determine credibility and the relative weight of the evidence. *See Plummer,* 186 F.3d at 429. Thus, an ALJ is entitled to make an adverse credibility determination as to a claimant's testimony regarding her limitations. *See Van Horn v. Schweiker,* 717 F.2d 871, 873 (3d Cir. 1983). Therefore, an ALJ's credibility determinations are entitled to great deference and should not be discarded lightly. *See Reefer v. Barnhart,* 326 F.3d 376, 380 (3d Cir. 2003). As the finder of fact, the ALJ can reject, partially or fully, subjective complaints if he finds them not credible based on other evidence in the record. *See Baerga v. Richardson,* 500 F.2d 309, 312 (3d Cir. 1974). For example, an ALJ is entitled to reject a claimant's complaints about her pain and other subjective symptoms, where such complaints are inconsistent with the objective medical evidence of record or her testimony about her medication and daily activities. *See Hartranft v. Apfel,* 181 F.3d 358, 362 (3d Cir.

16

1999). When an ALJ determines that a claimant's subjective complaints of pain and functional limitations are less than fully credible, he may reject any physician's opinion to the extent it is predicated upon the claimant's statements. *See Thompson v. Barnhart*, 382 F. Supp.2d 740, 747 (E.D. Pa. 2005).

As noted previously, the GAF is the scale used by mental health professionals to "assess current treatment needs and provide a prognosis." *See* 65 Fed. Reg. 50746-01, 50764-65. Although an ALJ's failure to explain how he weighed and discounted the significance of a claimant's GAF score can, in some circumstances, require a remand to clarify the basis of his holding,[5] it is also true that "the ALJ's failure to reference the GAF score in the RFC, standing alone, does not make the RFC inaccurate." *See Burley v. Barnhart*, No. 04-CV-4568, 2005 WL 2212363, at *4 n.11 (E.D. Pa. Sept. 9, 2005) (quoting *Howard v. Commissioner,* 276 F.3d 235, 241 (6th Cir. 2002)). As this Court recently noted:

> The use of the GAF scale, which considers psychological, social and occupational functioning on a hypothetical continuum of mental health, is not endorsed by the Social Security Administration because its scores do not have a direct correlation to the disability requirements and standards of the Act. *Instead, the ALJ is to consider the clinical findings contained in the narrative reports of medical sources, and is to weigh that evidence under the standards set forth in the regulations for evaluating medical opinion evidence, taking into account numerous factors including the opinion's supportability, consistency and specialization.*

*See Lyons v. Barnhart*, No. 05-CV-104, WL1073076, *5-6 (W.D. Pa. Mar. 27, 2006) (emphasis added) (citations and footnotes omitted). Thus, as long as the "the ALJ adhered to the foregoing

---

5       *See, e.g., Dougherty v. Barnhart,* No. 05-5383, 2006 WL 2433792 (E.D. Pa. Aug. 21, 2006); *see also Colon v. Barnhart,* 424 F. Supp.2d 805, 813 (E.D. Pa. 2006); *Span ex rel. R.C. v. Barnhart,* No. 02-7399, 2004 WL 1535768 (E.D. Pa. May 21, 2004); *Escardille v. Barnhart,* No. 02-2930, 2003 WL 21499999 (E.D. Pa. June 24, 2003).

standards in evaluating the medical evidence to assess Ryan's mental residual functional capacity," his decision must be affirmed. *Id.* at \*6.

Applying *Lyons* against the backdrop of the treating physician rule and the ALJ's prerogative to assess a claimant's credibility, it is clear that the ALJ in the case at bar considered Ryan's GAF scores, but declined to find that they rendered Ryan unable to work. The record shows that, after a single examination, Dr. Bridges assessed Ryan's GAF at 40 in October 2003. (R. 344). The ALJ specifically addressed this score and noted its significance in his decision, but explained why he rejected it:

> The undersigned only partially accepts Dr. Bridges' opinion, as his assessment of "marked" limitations and GAF assessment of 40 is not supported by the record and appears to be based solely on [Ryan's] subjective allegations. A review of Dr. Bridges' reports fails to reveal any demonstrated abnormalities or specific clinical findings which would lead to his conclusions. Moreover, [Ryan] admitted to Dr. Bridges that she was not receiving any current mental health treatment at the time of his examination. Dr. Bridges' assessment appears to be a "snapshot" opinion based upon a one-time evaluation as opposed to a longitudinal opinion.

(R. 17). The record also shows that, on March 30, 2004, Dr. Arul — a treating physician — had pegged Ryan's GAF at 50. (R. 417-18). The ALJ noted the significance of that score but rejected it, explaining:

> [T]he GAF assessment of 50 is completely at odds with [Ryan's] presentation at the mental status exam as well as her reported activities of daily living and clinical findings on multiple mental status exams. Moreover, subsequent records disclose that, with treatment, [she] has denied suicidal ideation and reported that she was doing better. On March 12, 2004, [her] therapist reported that [her] mood, affect, and cognitive functioning were appropriate.

(R. 18) (citation to record omitted). Between the ALJ's discussion of these two GAF scores is

18

his reasoning that, in light of the fact that Ryan's symptoms were improving with Zoloft, and given her impressive level of activity and interests, such low GAF scores could not be reconciled with the evidence of record. (*See* R. 17). Each of these explanations supplied a legitimate reason for the ALJ to reject these scores.

As the ALJ's explanation reflects, his rejection of Dr. Bridges' and Dr. Arul's GAF assessments was based in part upon his conclusion that these evaluations were based on statements by Ryan which were only partially credible. (*See* R. 17-18). To recapitulate, the ALJ rejected Ryan's account of her symptoms and limitations to the extent they "exceed[ed] what is shown by the objective medical evidence and treatment records," and specifically noted that Ryan's "statements of activities of daily living would not preclude all work activity." (R. 16). As credibility determinations go, this one was sparse, but acceptable. *See Drake v. Barnhart,* No. 04-CV-6084, 2005 WL 3078195, at *5 (E.D. Pa. Nov. 15, 2005) (concluding that an ALJ's credibility finding was sufficient where, although he did not make specific findings as to each aspect of the testimony, his "decision explicitly stated that he found Plaintiff's subjective complaints credible only to the extent that they were supported by the evidence of record as summarized in the text of his decision."). Ryan does not challenge the ALJ's adverse credibility determination, (*see generally* Pl. Mot.), and the Court finds that substantial evidence supports it.[6] (*See* R. 391-99). Ryan apparently does not dispute the ALJ's finding that Dr. Bridges and Dr. Arul assigned GAF scores by taking her statements at face value. (*See* Pl. Mot. at 11-12). The

---

[6]     Although the Court could treat the ALJ's credibility findings as stipulated given Plaintiff's failure to challenge them, instead it will affirm them as long as they are supported by substantial evidence. *See Sklenar v. Barnhart,* 195 F. Supp.2d 696, 698 n.2 (W.D. Pa. 2002) (where necessary to review findings that a claimant "does not challenge," the findings would be accepted as long as the Court "otherwise concludes they are supported by substantial evidence.").

19

record reflects that Ryan's statements accounted for most, if not all, of both GAF assessments, neither of which was supported by any objective testing. *(See* R. 340-46, *see also* 417-18). This being so, to the extent that the ALJ rejected Ryan's statements about her limitations and symptoms, he was entitled to reject any medical opinion based on those statements. *See Thompson,* 382 F. Supp.2d at 747; *see also Reed v. Barnhart,* 419 F. Supp.2d 625, 631, 634 n.10 (D. Del. 2006) (same).

Additionally, and as noted above, the ALJ specifically found that the dismal GAF score given by Dr. Bridges seemed to fly in the face of a medical record which indicated that Ryan experienced significant improvement of her symptoms on Zoloft just a few weeks later. (R. 17). The ALJ was entitled "to consider evidence of the type of medication (including its effectiveness and side effects) that the claimant takes" in assessing her "statements as to the severity of her impairments." *See Lozado v. Barnhart,* 331 F. Supp.2d 325, 340 n.23 (E.D. Pa. 2004) (quoting SSR 96-7p). Once more, Ryan does not challenge this reading of the medical record.

*(See generally* Pl. Mot.). Indeed, this Court's review of the record confirms that Dr. Bridges' opinion was rendered before Ryan had switched medications from Prozac, which had been ineffective, to Zoloft. *(See* R. 341). A short time after switching medications, Ryan reported significant improvement in her symptoms without side effects. *(See* R. 370, 376, 379, 405, 417 (all reflecting Ryan's statements to doctors to the effect that her symptoms had responded well to Zoloft)). "If a symptom can be reasonably controlled by medication or treatment, it is not disabling." *See Dass v. Barnhart,* 386 F. Supp.2d 568, 577 (D. Del. 2005) (quoting *Gross v. Heckler,* 785 F.2d 1163, 1165-66 (4th Cir. 1986)); *see also Dearth v. Barnhart,* 34 Fed.Appx. 874, 875 (3d Cir. 2002) (citing *Gross* in affirming an ALJ's decision, where the claimant "told his doctor that his regimen of Paxil 'seemed to be working' and that he felt 'pretty good.'").

Accordingly, substantial evidence supports the ALJ's characterization of Dr. Bridges' GAF

assessment as a "snapshot" with little longitudinal relevance.[7]

The ALJ's observation that Dr. Arul's GAF assessment of 50 was "completely at odds

with [her] presentation at the mental status exam," (R. 18), likewise enjoys substantial support in

the medical record and supplied an appropriate reason for rejecting his GAF assessment. Dr.

Arul's characterization of Ryan's appearance during her mental status examination was as

follows:

> [Ryan] appeared appropriate for her stated age. She was neatly dressed.
> Normal gait. No unusual mannerisms. Her speech was coherent and
> spontaneous. Her mood was depressed. She denies any active plans of
> suicide. There was no evidence of any hallucinations or delusions. She
> was alert and oriented. Her memory function is intact. She has limited
> insight and judgment.

(R. 418). Notwithstanding this presentation, and although Ryan consistently had reported

improvement of her symptoms on Zoloft, (R. 417), Dr. Arul rated Ryan's GAF at 50.

(*See* R. 418). An ALJ may give little weight to a doctor's opinion that a claimant is disabled

where, as here, his "disability determination [is] inconsistent with the [d]octor's own

observations and the remainder of the record." See *Woodson v. Barnhart,* No. 06-CV-105, 2006

WL 2385520, at *3 (E.D. Pa. Aug. 14, 2006). Accordingly, the incongruity between Dr. Arul's

GAF assessment and Ryan's appearance at the mental status examination in which that

---

[7]     Despite Plaintiff's objection to the ALJ's characterization of Dr. Bridges' GAF
        assessment as a "snapshot," (*see* Pl. Mot. at 12), in fact the ALJ adopted this assessment
        from Dr. Golin's report. (*See* R. 17, 353). Because that report is consistent with the
        evidence of record, it constitutes substantial evidence for rejecting Dr. Bridges' appraisal
        of Plaintiff's GAF. *See See Jones ,* 954 F.2d at 128-29; *see also* 20 C.F.R.
        §416.927(d)(4).

assessment was made was yet another legitimate reason for the ALJ to reject this score.[8]

Ryan complains, however, that the ALJ did not explain why he had rejected several other GAF score assessments of 50, all of which appear in Latrobe Mental Health Center treatment notes between November 2003 and December 2004. (*See* Pl. Mot. at 9 (citing R. 409-16)). The Court rejects this argument because Ryan has mischaracterized the nature of this evidence and the consideration that the ALJ gave it. Although Ryan implies that these other scores were "opinions" rendered by "treating physicians," (*see* Pl. Mot. at 10), a review of the record Ryan has cited indicate that eight of these additional GAF scores actually were fill-in-the-blank notations made by a single "L.S.W.," or licensed social worker. (*See* R. 409-16). A licensed social worker is not an "acceptable medical source" within the meaning of the pertinent regulations. *See* 20 C.F.R. §404.1513(a) (noting that acceptable medical sources include licensed physicians, licensed or certified psychologists, licensed optometrists, licensed podiatrists and qualified speech-language pathologists). Thus, these eight GAF assessments are not "medical opinions" as Ryan implies (*see* Pl. Mot. at 14, 16), and thus, were not entitled to controlling weight. *See* 20 C.F.R. §404.1513(d). To the extent that two of these scores were rendered by an

---

[8]     *See also Garcia v. Barnhart*, No. 04-CV-5416, 2005 WL 2178907, at *2 (E.D. Pa. Sept. 6, 2005) (finding no error in ALJ's rejection of a psychiatric evaluation "because of an unexplained inconsistency in that it contained a GAF score of 35 but reported Garcia's mental status to be normal," where "[t]he remainder of Garcia's GAF scores noted throughout the Treatment Plans are juxtaposed by generally positive mental status remarks in his Psychiatric Notes, explaining that "[a]lthough the ALJ could have more directly compared the inconsistency between the GAF scores in the Treatment Plan with the Psychiatric Notes, the inconsistency is nonetheless made evident by the fact that the GAF scores range from 45-50 while the Psychiatric Notes convey improvement"); *see also Rosado v. Barnhart*, No. 05-CV-1743, 2006 WL 2034720, at *1 (E.D. Pa. July 18, 2006) (finding that the ALJ did not err in failing to credit a treating physician's GAF assessment of 45, where that assessment had been made when Plaintiff was not on her medication, and where her presentation at the examination showed that her "speech was fluent and nonpressured," that the claimant "was alert and cooperative with no psychotic symptoms," and that her "thought processes were logical and goal directed [with] good judgment and fair insight.").

unidentified physician in October and December 2004 on a check-the-box form, (*see* R. 404, 406), they nevertheless are included in an exhibit that the ALJ demonstrably *did* consider when he rejected Dr. Arul's GAF assessment of 50. (*See* R. 19 (citing Exhibit 11F twice); *see also* R. 2 (noting that R. 409-16 is included in Exhibit 11F)). Thus, although the ALJ only mentioned Dr. Arul's March 2004 GAF assessment of 50 in his discussion of the Latrobe Mental Health records, the ALJ's citation of other portions of this exhibit permits the inference that he rejected all of the GAF scores of 50 assessed at Latrobe Mental Health. This was appropriate. *See Cotter,* 650 F.2d at 482 (noting that "the ALJ is not required to supply a comprehensive explanation for rejection of evidence; in most cases, a sentence or short paragraph would probably suffice"); *see also Fargnoli,* 247 F.3d at 42.

In the end, despite Ryan's insistence that the ALJ's discussion of her GAF scores reflects that he "reject[ed] 11 medical expert opinions," a correct reading of the medical record shows that the ALJ only rejected *part* (not all) of *two* (not eleven) opinions — one given after a one-time examination, and another given by a treating physician with the input of a social worker. It is well-established that an ALJ properly may accept some parts of the medical evidence and reject other parts. *See Adorno,* 40 F.3d at 48. Equally well-established is the principle that a reviewing court may not re-weigh the medical opinions of record, but may consider only whether the ALJ's weighing of such opinions was supported by substantial evidence. *See Monsour Medical Ctr. v. Heckler,* 806 F.2d 1185, 1190 (3d Cir. 1986). Against that standard of review, it is clear that Ryan has not demonstrated that the ALJ's rejection of her GAF scores was unsupported by the evidence of record. Therefore, the Court finds that remand is unwarranted.

## C.   The Hypothetical Question The ALJ Posed To The Vocational Expert Included All Of Ryan's Limitations For Which There Is Substantial Evidence Of Record

Finally, on the strength of her assertion that the ALJ committed "[t]he above errors," Ryan argues that the ALJ's assessment of her residual functional capacity was underinclusive of her limitations and, thus, her hypothetical question to the vocational expert was fatally flawed. (Pl. Mot. at 14).

The ALJ's hypothetical question to a vocational expert "must reflect all of a claimant's impairments that are supported by the record"; otherwise, the Commissioner may not rely on the expert's answer to that question to satisfy its step-five burden of proof. *See Chrupcala v. Heckler,* 829 F.2d 1269, 1276 (3d Cir. 1987) (citing *Podedworney v. Harris,* 745 F.2d 210 (3d Cir. 1984)).  A corollary to this principle is that "the ALJ need not question the vocational expert about alleged impairments that are not supported by the record." *Palacios v. Barnhart,* No. 05-CV-4921, 2006 WL 3302443, at *4 (E.D. Pa. Nov. 13, 2006).  Limitations that are medically supported, but contradicted by other evidence, may or may not be credited by the ALJ and included in the hypothetical question. *See Rutherford v. Barnhart,* 399 F.3d at 546, 554 (3d Cir. 2005).

As explained above, the Court concludes that the ALJ did not err in failing to discuss the November 19, 2004 I.Q. test completed by Frank Lang, M.A.; in any event, a review of the hypothetical question that the ALJ posed to the expert shows that it *did* account for the limitations caused by Ryan's intelligence. (*See* R. 39-40).  Furthermore, the Court already has explained why the GAF scores assessed by Dr. Bridges and Dr. Arul — as well as the social worker's GAF assessments which were identical to Dr. Arul's scores — were not consistent with

24

the record as a whole. That being so, the ALJ was not obliged to express these GAF scores as concrete limitations in his question to the vocational expert. *See Rutherford*, 399 F.3d at 554. Because Ryan's entire challenge to the content of the hypothetical question that the ALJ posed to the vocational expert rises and falls with the aforementioned claims of error, and because those claims are meritless, the Court finds that the vocational expert's answer to that question supplied substantial evidence in support of the Commissioner's ultimate conclusion that Ryan could perform other jobs and, thus, was not disabled at step-five. *See Burns,* 312 F.3d at 123.

## VI.  Conclusion

For all the foregoing reasons, the Court concludes that the ALJ's determination enjoyed the support of substantial evidence, and was consistent with the governing regulations. *See* 20 C.F.R. §§404.1529 and 416.929(b).   Accordingly, the Court will deny Ryan's motion for summary judgment, grant the Commissioner's motion for summary judgment, and affirm the decision below.

An appropriate order follows.

Thomas M. Hardiman
United States District Judge

January 24, 2007

25

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JENNIFER RYAN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 05-1423 |
| | ) |
| | ) |
| JO ANNE B. BARNHART, | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

## ORDER OF COURT

AND NOW, this ___21ᵗʰ___ day of January, 2007, in accordance with the foregoing

memorandum opinion, it is HEREBY ORDERED as follows:

    1.  Defendant's Motion for Summary Judgment (Document No. 10) is GRANTED.

    2.  Plaintiff's Motion for Summary Judgment (Document No. 8) is DENIED.

    3.  The decision of the Commissioner is affirmed, and judgment is entered in favor of

Defendant.

BY THE COURT:

Thos M. Hardiman

Thomas M. Hardiman
United States District Judge